UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION

---

1789 FOUNDATION, INC. d/b/a
CITIZEN AG and JENNIFER McKINNEY,

       Plaintiff,

v.

ELECTRONIC REGISTRATION
INFORMATION CENTER, CENTER
FOR ELECTION INNOVATION AND
RESEARCH, DAVID J. BECKER,
in his individual and official capacities,
and the WISCONSIN DEPARTMENT OF
TRANSPORTATION,

       Defendants.

Case No.: 3:24-cv-00755

---

## COMPLAINT

---

Plaintiffs 1789 FOUNDATION, INC. d/b/a Citizen AG ("Citizen AG") and JENNIFER McKINNEY ("Ms. McKinney") (collectively, "Plaintiffs"), by and through undersigned counsel and pursuant to 18 U.S.C. § 2721 *et seq.*, file this Complaint for declaratory and injunctive relief and monetary damages against Defendants the Electronic Registration Information Center ("ERIC"), the Center for Election Innovation and Research ("CEIR"), David J. Becker ("Becker"), in his individual and official capacities ("Becker") and the Wisconsin Department of Transportation ("WisDOT"), on the grounds and in the amounts set forth as follows:

### <u>INTRODUCTION</u>

This is a privacy and voting rights action brought to redress a scheme Becker orchestrated and carried out through his two ostensibly "nonpartisan" organizations, the ERIC and the CEIR. In particular, Becker exploited the tax-exempt status ERIC obtained to infiltrate WisDOT's

Division of Motor Vehicles ("DMV") database to access the driving records containing the personal information of millions of Wisconsin residents and eligible American voters, including Citizen AG members such as Ms. McKinney to use for unlawful purposes in violation of the Driver's Privacy and Protection Act ("DPPA").

Following the United States Supreme Court's 2010 landmark decision in *Citizens United*[1], Becker developed a plan to add "millions of new voters onto the rolls through a modernized registration system."[2] To accomplish this, Becker began by forming ERIC, a 501(c)(3) tax-exempt organization that purportedly exists to "improve voter roll accuracy."[3]

The way the scheme works begins when a state joins ERIC and signs its membership agreement. Under the ERIC membership agreement, ERIC promises its member-states that, in exchange for a $25,000 payment, hundreds of thousands in annual dues, and unfettered access to its DMV databases, ERIC will contact ninety-five percent (95%) of the names it puts on the state's "eligible but unregistered" lists—which include non-citizens—and increase accuracy in the member state's voter rolls. Notwithstanding the fact that over a decades' worth of data reveals that ERIC actually makes voter rolls ***less*** accurate, these ERIC membership agreements are nothing more than trojan horse contracts that Becker relies upon to infiltrate the statewide DMV databases of more than half the country, or 271 total votes of the Electoral College.

Once the ERIC agreement is signed, it imposes contractual obligations upon its member-states to provide it with the sensitive, otherwise inaccessible personal information contained in the driving records of its member-states' residents every sixty (60) days. This is not a permitted use of data or personal information obtained from driving records under the Driver's Privacy and

---

[1] *Citizens United v. FEC*, 558, U.S. 310 (2010).
[2] Ludwig, Hayden, How the Left Fooled States Into Boosting Democratic Turnout—and How to Stop It, RESTORATION NEWS (Mar. 15, 2023), available at: https://citizenag.link/byn.
[3] https://ericstates.org (last visited October 27, 2024)

Protection Act ("DPPA"). In fact, DPPA provides for fourteen (14) exceptions to the use of this highly-sensitive information and not one of these even tangentially pertains to voting or elections.

Regrettably, it gets even worse. Plaintiffs bring this action against Becker's other not-for-profit organization, the CEIR, because Becker, ERIC, and CEIR have knowingly used, obtained, and/or disclosed personal information that was sourced from motor vehicle records (i.e., the WisDOT DMV records) for a purpose other than the 14 enumerated permissible uses under the DPPA, and each defendant will continue to use, obtain, and/or disclose this personal information for impermissible purposes absent the relief requested here.

In short, Becker, by and through ERIC, uses a trojan-horse-contract-veiled-as-a-membership-agreement to obtain personal information from the driving records stored in our nation's statewide DMV databases. Once ERIC obtains this personal information, Becker then "switches hats" and steps into the shoes of CEIR's Executive Director, where he weaponizes the personal information unlawfully disclosed to him/ERIC by WisDOT. With this information in hand, Becker and his two not-for-profits engage in campaign and political activities, including, without limitation, partisan voter outreach, text messaging, and registration solicitation.

Under the veil of CEIR, Becker also uses the personal information he obtains from driving records as bait to attract the likes of wealthy, partisan, and politically motivated donors, such as Mark Zuckerberg. A recipient of the infamous "Zuckerbucks" in 2020, CEIR used the funds it garnered to issue "grants" to various Secretaries of State for the purpose of "urgent voter education assistance." As just one example, Becker exploited CEIR to facilitate a $11.9 million payment to Michigan's Secretary of State, Jocelyn Benson, which she, in turn, used to pay powerhouse political consulting firms for "media and strategy purchase." Ultimately, these funds were used to pay for targeted television and radio ads and text message campaigns in critical swing states. While

3

Becker does this and uses personal information obtained from driving records in all 24[4] of its member-states, what makes it particularly egregious in Wisconsin is that **Wisconsin is not an ERIC member** and has not been an ERIC member since terminating its membership agreement on June 30, 2016.

While, of course, it is immaterial whether a contractual agreement exists between a state and a private third-party like ERIC if the subject matter of the contract is unlawful, assuming *arguendo* that the use or disclosure of personal information obtained from driving records became lawful upon execution of a valid contract, that is not the fact pattern, here. Specifically, upon learning that its members were growing concerned about the state of Wisconsin's voter rolls, including whether state and local officials were complying with federal and state list maintenance requirements, Citizen AG began investigating the issue. Among other things, Citizen AG submitted a request to the Wisconsin Election Commission ("WEC") and asked for a current copy of Wisconsin's membership agreement with ERIC. The next day, WEC responded to the request by providing a single document: a copy of an ERIC membership agreement executed and entered into by and between ERIC and the Wisconsin Government Accountability Board ("GAB"). No other document was provided.

Notably, just forty-four (44) days later, on June 30, 2016, GAB was eliminated, thereby terminating the contractual relationship between ERIC and the State of Wisconsin. No subsequent agreement was entered into, and no amendment to the underlying agreement was made prior to GAB's elimination. Therefore, Wisconsin and ERIC have not been in a contractual relationship for over eight (8) years. Despite this, Defendants have disclosed, used, and obtained personal information from driving records of Wisconsin residents and voters. Given this protracted pattern

---

[4] ERIC's members consist of 23 states and the District of Columbia.

and practice of unlawful, criminal activity, it can be expected that Defendants will continue to do so – for the next 8 years or even longer – absent the relief requested herein.

In sum, Defendants ERIC and CEIR, vis a vis and lead by their respective founder, Defendant David Becker, along with the WisDOT have knowingly engaged in and will continue to knowingly and intentionally engage in a coordinated effort to obtain, use, and disclose sensitive, protected personal information of Wisconsin residence from driving records obtained through the Wisconsin DMV in violation of federal law, and with the intent to compromise and undermine the fundamental right to vote of millions of Wisconsin voters. This Complaint seeks not only to hold ERIC, CEIR, Becker, and WisDOT accountable, but to restore the integrity and public confidence in our nation's nonpartisan electoral process.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, and in particular, 52 U.S.C. §§ 20507 and 20510(b).

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because at least one defendant resides in this district and because a substantial part of the events and omissions giving rise to the claims herein occurred in this district.

3.      The allegations raised herein pertain to one or more violations of the National Voter Registration Act ("NVRA") that occurred within thirty (30) days of a federal election and therefore, any notice-related conditions precedent to maintaining this action are waived entirely pursuant to 52 U.S.C. § 20510(b)(3).

## PARTIES

4.      Plaintiff 1789 Foundation, Inc. d/b/a Citizen AG ("Citizen AG") is a nonprofit organization organized under the laws of the State of Florida dedicated to educating Americans

about their rights and to advocating, protecting, and preserving American civil liberties and constitutional rights through an array of means that include, without limitation, public records requests and litigation.

5.     Citizen AG is supported in its mission by thousands of individuals across the nation. An individual becomes a member of Citizen AG by making a financial contribution, in any amount. Members' financial contributions are by far the single most important source of income to Citizen AG and provide the means by which the organization finances its activities in support of its mission. Citizen AG in turn advocates for and defends the interests of its members when issues of widespread impact related to the constitutional rights of the members and Americans at-large are violated or infringed upon.

6.     Over the past several years, Citizen AG's members have become increasingly concerned about the state of the nation's voter registration rolls, including whether state and local officials are complying with the DPPA and how their personal information is being used. They are concerned that the forthcoming violations of the DPPA and the use and disclosures of personal information from driving records impairs the integrity of elections by increasing the opportunity for ineligible voters or voters intent on fraud to cast ballots.

7.     Defendants' violations of the DPPA voter list maintenance obligations burden the federal and state constitutional rights to vote of all individual members of Citizen AG who are lawfully registered to vote in Wisconsin by undermining their confidence in the integrity of the electoral process, discouraging their participation in the democratic process, instilling in them the fear that their legitimate votes will be nullified or diluted, and actually diluting their votes.

8.     Protecting the voting rights of Citizen AG members who are lawfully registered to vote in Wisconsin is well within the scope of the reasons why members of Citizen AG join the organization and support its mission, and is germane to Citizen AG's mission.

9.     Because the relief sought herein will inure to the benefit of Citizen AG members who are lawfully registered to vote in Wisconsin, neither the claims asserted, nor the relief requested, requires the participation of Citizen AG's individual members.

10.     In response to the concerns of its members, Citizen AG commenced a nationwide program to monitor state and local election officials' compliance with the DPPA. As part of this program, Citizen AG utilized public records laws to request and receive records and data from jurisdictions across the nation about their voter list maintenance efforts. It then analyzed these records and informed the general public about their rights and the findings that have been uncovered.

11.     Citizen AG's concerns with Defendants' violations of the DPPA led it to send the August 2024 correspondence described herein seeking Wisconsin's ERIC membership agreement and list maintenance practices, and the resultant findings culminated in this action.

12.     Citizen AG has devoted substantial resources, including staff time, to investigating the Defendants' alleged violations of the DPPA, assessing their impact on Wisconsin's voter registration lists, and communicating with its members who have concerns about the integrity of their State's voter rolls. In addition, Citizen AG has invested significant efforts into researching and addressing the broader implications of privacy and voting rights infringements caused by the misuse and unlawful disclosures of personal information contained in the State's DMV driving records database. These efforts, aimed at addressing the bloating of voter rolls in both member states and non-member states like Wisconsin, exceed Citizen AG's regular, programmatic activities related to monitoring DPPA compliance by state and local election officials.

13.     Plaintiff Jennifer McKinney ("Ms. McKinney") is a registered Wisconsin voter and a taxpayer residing in Lacrosse County, Wisconsin. Ms. McKinney has had her personal

information from driving records unlawfully obtained, used, and disclosed by WISDOT, Becker, ERIC, and the CEIR for partisan political activity.

14.     Citizen AG and Jennifer McKinney (collectively, "Plaintiffs") seek declaratory and injunctive relief pursuant to 52 U.S.C. § 20510(b)(1), which authorizes a private citizen to bring this suit to enforce the NVRA, and pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

15.     Each plaintiff is and has been harmed and aggrieved by the conduct of the Defendants as described further herein.

16.     Ms. McKinney has standing  under Wis. Stat. § 5.06, insofar as Ms. McKinney is a taxpayer and Defendants are spending taxpayer money on illegal activities or funding activities that are expressly prohibited under federal law.

17.     Citizen AG has standing as an aggrieved party under Wis. Stat. § 227.40 because the Defendants' alleged DPPA violations have directly and proximately forced it to divert resources from its regular, programmatic activities. These diverted resources were necessary to prevent further violations of federal law and protect constitutional rights, including those of its members and Wisconsin's eligible voters. This diversion of resources would not have been necessary if not for Defendants' noncompliance, requiring Citizen AG to take action to safeguard its members' rights and the rights of all eligible voters in Wisconsin.

18.     Defendant Electronic Registration Information Center ("ERIC") is a 501(c)(3) organization founded by Defendant David Becker that maintains its principal place of business in the District of Columbia, located at 1201 Connecticut Ave NW, Suite 600, Washington, D.C. 20036. According to its most recent Form 990 filing from the 2021 fiscal year, ERIC's mission and stated exempt purpose is "a membership organization consisting of state election officials working together to improve the accuracy of state voter registration lists."

19.     Defendant Center for Election Innovation and Research ("CEIR") is a 501(c)(3) organization founded by Defendant David Becker, with its principal office located at 1802 Vernon Street NW, PMB 2393, Washington, D.C. 20009. According to its most recent Form 990 filing for the 2021 fiscal year, CEIR's stated mission and tax-exempt purpose is to support state election officials in enhancing the accuracy of voter registration lists.

20.     Defendant David J. Becker is the founder of ERIC and CEIR, as well as CEIR's current Executive Director. He is being sued in both his official and individual capacities. At all times relevant, Becker operated as an official and agent of both ERIC and CEIR and his actions impute liability to both organizations under the theory of *respondeat superior*.

21.     Respondent Wisconsin Department of Transportation ("DOT") is a department of Wisconsin state government. Sec. 15.46. The Division of Motor Vehicles ("DMV") is a division of DOT, and acts and matters alleged in relation to DMV are those of and attributable to DOT. E.g., § 343.165(8)(b)2.

## STATEMENT OF FACTS

### I.  David Becker, the Founder of ERIC

22.     Prior to founding ERIC and the CEIR, Becker previously worked as an attorney in the Voting Rights Section of the Civil Rights Division of the U.S. Department of Justice ("DOJ").

23.     Becker's tenure with the DOJ abruptly ended in 2005 after an ethics investigation revealed that he contacted the City of Boston and offered his services to defeat a lawsuit brought by the DOJ—his own employer—seeking to enforce federal voting rights laws against the City.

24.     Brad Schlozman, the acting-head of the DOJ's Civil Rights Division at the time, described the Becker's misconduct as "the most unethical thing [Scholzman] had ever seen."[5]

---

[5] W.J. Kennedy, Mark Zuckerberg beneficiaries promoting fair elections not exactly non-partisan as advertised, LEGAL NEWSLINE (Sept. 30, 2020), available at: https://citizenag.link/c0a8d7.

Scholzman also made clear Becker's overt partisan leanings, describing him as a "hard-core leftist" who "couldn't stand conservatives."[6]

25.     Hans von Spakovsky, who served as counsel the Assistant Attorney General for the DOJ's Civil Rights Division at the time, echoed Schlozman's account of Becker's bias, stating:

> In his role with the DOJ, [Becker] was supposed to be non-partisan, but his emails uncovered in the Boston investigation revealed nasty, disparaging remarks about Republicans. Very unethical and unprofessional. **I would never hire or trust [David Becker].**[7]

26.     After the 2005 ethics probe culminated in the conclusion of Becker's employment with the DOJ, Becker began working for People for the American Way ("PFAW"), an organization that prides itself on its "deep expertise in fighting the Right" and vows to be "committed to redoubling [its] efforts to invest in the next generation of progressive champions."[8]

27.     Becker worked as a lobbyist for PFAW from 2005 to 2008, when he left to become the Director of Election Initiatives at Pew Charitable Trusts ("Pew").

28.     Two years later, the U.S Supreme Court's landmark decision in *Citizens United v. Federal Election Commission*,[9] prompted widespread panic amongst Democrats.

29.     One such panicked response came from the Brennan Center, which published a report in April 2010, stating, in pertinent part:

> [O]ur political system is broken…Congress is dysfunctional. Special interests have generated gridlock and blocked change. This past year showed that unless we repair our democracy, the progressive agenda will stall.[10]

30.     The Brennan Center's report also proposed a need to register "millions of new voters onto the rolls through a modernized registration system."[11]

---

[6] *Id.*
[7] *Id.* (emphasis added)
[8] People for the American Way, *Our Mission*, available at: https://citizenag.link/04j (last visited October 27, 2024)
[9] *See* fn. 1.
[10] Ludwig, Hayden, How the Left Fooled States Into Boosting Democratic Turnout—and How to Stop It, RESTORATION NEWS (Mar. 15, 2023), available at: https://citizenag.link/byn.
[11] *Id.*

31. Becker concurred with the Brennan Center's report and concluded that, in his mind, the biggest shortcoming in the American electoral process was voter registration. He also believed, however, that Congress was too politically divided to promote voter registration.

32. Because of this, Becker sought an alternative avenue through which he could bypass Congress and grab hold of the voter rolls across America.

33. Becker concluded he could use the nonprofit sector to create an entirely new organization to facilitate mass voter registrations and, because of its novelty, avoid the naturally-placed mistrust in already-existing third-parties, such as Pew, as the entity to carry out his agenda.

34. By the end of 2010, Becker's plan to form ERIC had been all but finalized. The problem he now faced was obtaining the financial support to bring his plan to life.

## II.  ERIC's Seed Funding and Ties to Partisan Mega-Donors & Organizations

35. While Becker knew he could not launch his mass voter registration initiative under Pew due to the mistrust and opposition he would face, that did not mean he could not engage Pew as a pass-through entity that facilitated Becker's access to funds so he could ERIC. And that is precisely how Becker got ERIC off the ground.

36. In 2008, Becker became an employee of Pew, knowing he had access to exorbitant financial resources that could issue grants to Pew that, once received, Becker could use those to create ERIC. Becker only needed to figure out who would be willing to issue Pew the grant money ERIC needed.

37. In 2011, the Foundation to Promote Open Society ("Open Society") rose to the occasion, issuing Pew two grants for a combined total of $725,000.[12]

---

[12] Internal Revenue Service Form 990-PF, Foundation to Promote Open Society, Part XV, attach. 16 at p. 143, available at: https://citizenag.link/3tn.

38.     It is important to note that, when it comes to American politics, Open Society, which was founded in 1979 by far-Left mega donor, George Soros, **exclusively** contributes to partisan objectives, initiatives, organizations, and politicians. The magnitude of Open Society's partisanship is highlighted by simply looking at its financial contributions since 2000.

39.     Over the last twenty-four (24) years, Open Society has contributed more than $21 **billion** to Democrats and liberal-backed, or far-left, organizations, initiatives, or campaigns.

40.     Over that exact same time, Open Society has donated $0.00 to Republicans or conservative organizations, initiatives, or campaigns

41.     According to its 2011 Form 990 filings, Open Society issued the first grant to "support the Pew Center on the States' voter registration modernization initiative,"[13] while the second grant was issued for purpose of providing "renewed project support to the Pew Charitable Trusts' Elections Initiatives to modernize voter registration systems; and to provide new project support to elections initiatives to expand the scope and scale of the Voter Information Project."[14]

42.     That following year, in 2012, Becker formally launched ERIC with its inaugural class of seven (7) member-states.

### III.  ERIC's Membership Agreement & the Alleged Services it Performs

43.     By creating ERIC under the veil of Pew, Becker was able to not only bypass Congress and create a national voter list of his own, but evade the opposition and mistrust that he knew would naturally arise if the public had knowledge of ERIC's origins and financial backing.

44.     Without this scrutiny, Becker was in a much better position to coax states into signing on as ERIC members, and Becker succeeded in bringing on seven (7) member-states at the time ERIC was formally launched in 2012.

---

[13] W.J. Kennedy, *Mark Zuckerberg Beneficiaries Promoting Fair Elections Not Exactly as Non-Partisan as Advertised*, LEGAL NEWSLINE (Sept. 4, 2020), available at: https://citizenag.link/c0a8d7.
[14] *Id.*

45.     At its core, ERIC exists for two reasons: serve as a vehicle to (1) bloat America's voter rolls, and (2) grant Becker access to sensitive, personal data and information that he could not have otherwise obtained but-for entering into a contractual agreement with member-states that compelled them to hand it over to Becker.

46.     Becker's business model is quite simple: Becker promises member-states that ERIC will "reduce the costs and increase the accuracies and efficiencies associated with [its member-states'] use of voter registration systems" (the "Services") in exchange for the member-states' promise to (1) a one-time payment of $25,000 as an initiation fee; (2) pay ERIC tens of thousands in annual "dues"; and (3) grant ERIC access to hyper-sensitive, state-controlled databases that include personal information and details about each and every one of the state's residents.

47.     At its peak, Becker convinced thirty-two (32) states and the District of Columbia – almost 3/4 of the nation – to join ERIC under these terms.

48.     With its 33 member states, Becker received millions of dollars' worth of revenue comprised exclusively of state funds—including funds paid by the federal government—but also control over 354 of 538 electoral votes, which translates to **Becker having had control over the voter registration lists that dictate 65.8% of all votes cast in the United States of America**.

49.     In addition to the ERIC membership agreements' terms that contractually entitle ERIC to tens of thousands of dollars in annual payments from its member-states (all of whom are recipients of federal funding) and unfettered access to data otherwise unavailable to any other non-public person or entity, these also granted ERIC a hyper-valuable bargaining chip to attract significant financial investment by those who wish to influence elections.

50.     It is also an incredible amount of money for an organization that has no staff or physical office, let alone data servers to store the massive amount of information it obtains from its member-states.[15]

51.     Among those individuals, is Mark Zuckerberg, the Founder and CEO of Meta Platforms, Inc. (formerly, "Facebook"), the significance of which is explained below.

52.     In short, Becker had means, the desire, and the data to change the course of elections, but no lawful way to make his agenda become a reality. This is especially true in light of the fact that ERIC's member agreements bound ERIC to only use its member-states' data to "reduce the costs and increase the accuracies and efficiencies associated with [its member-states'] use of voter registration systems." Notably, even contractual obligations are illusory, as it is well-established consideration under a contract cannot be predicated upon unlawful activities. Even more, ERIC is a 501(c)(3) organization; thus, at all times relevant it was and is prohibited from engaging in partisan political activity, engaging in substantial lobbying, and profiting off its work.

53.     As a result, and to circumvent these contractual provisions and federal regulations, Becker created another layer to the shell game of liability: CEIR.

## IV.  Becker Launches the Center for Election Innovation & Research ("CEIR")

54.     Becker knew that using ERIC's member-states' sensitive, private, and hyper-protected personal data for purposes outside the purview of the contractually agreed upon services and permissible limits of federal data privacy laws would not only constitute a breach of contract, but criminal sanctions.

---

[15] On February 15, 2023, Alabama Secretary of State Wes Allen made an unannounced visit to the published address of ERIC's headquarters at 1201 Connecticut Ave NW Ste 600 in Washington, D.C. Upon finding that the location was actually the home of a virtual shared workspace and that no ERIC headquarters existed at the location, Allen stated, "I was in DC for a meeting of the National Association of Secretaries of States and, since I was in town, I went to see the ERIC Headquarters . . . I found [] **there was no ERIC headquarters at that address. There were no employees. There were no servers. There was no ERIC presence of any kind." (**Ludwig, Hayden, How the Left Fooled States Into Boosting Democratic Turnout—and How to Stop It, RESTORATION NEWS (Mar. 15, 2023), available at: https://citizenag.link/byn. (emphasis added).

55.     Thus, in order to make it appear as though ERIC was fully-compliant with these legal parameters, he created a second nonprofit organization through which he could use the data to influence American elections.

56.     Since Becker is founder of both ERIC and CEIR, as well as CEIR's Executive Director, Becker exploited this loophole and, technically, did not disclose this data to a third-party. Rather, he simply "switched hats" between acting under ERIC and acting under CEIR, depending on what specific activity he was engaging in at the time.

57.     It is worth noting that while Becker claims he "stepped away" from ERIC once CEIR was formed, his own emails and other evidence demonstrate otherwise.

58.     In fact, the only support for Becker's assertion that he "stepped away" from ERIC is a typographical update on ERIC's website that lists Becker as a "Non-Voting Board Member" of ERIC's Board:



## V.  Becker's Control Over ERIC while serving as CEIR's Executive Director.

59.     While this gesture offers little-to-no evidentiary weight as to whether Becker did and does or does not retain control over ERIC while working at CEIR, it is immaterial to answering the question of whether Becker exercised control or authority over ERIC as an organization. Stated differently, Becker could be a non-voting board member of ERIC while still dictating and controlling the manner in which ERIC operates and what activities it engages in.

60.   To that end, as a non-voting member of ERIC's board, Becker still maintained and exhibited control over ERIC's activities and objectives.

61.   For example, in April 2020, ERIC hosted a meeting with representatives from its member-states' respective Department of State offices. During this 57-minute meeting, Becker spoke on behalf of ERIC—**not** CEIR—and, at one point, even went so far as to say that he "personally is going to be very active in continuing to try to bring California on board" as an ERIC member state.

62.   At another point during the call, a member-state representative asked how undelivered mail should be reported to ERIC. Becker – and not "then-Executive Director," Shane Hamlin, who was on the call – answered.

63.   In fact, despite Mr. Hamlin being on the near-hour long call, he never once uttered a single word.

64.   Further evidence that Becker remained part of ERIC and managed its day-to-day operations even while serving as official Executive Director of CEIR is made clear on May 15, 2020, email shown below:



| | |
|---|---|
| **From:** | David Becker <dbecker@electioninnovation.org> |
| **Sent:** | Friday, May 15, 2020 3:23 PM |
| **Subject:** | Elections zoom meeting on Friday, 5/22, at 6pm ET/3pm PT |

**EXTERNAL EMAIL:** Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Hi all,

Shane Hamlin and I have discussed doing another virtual get-together with the folks in the states (we did a small one last Friday) to catch up and hang out. No particular agenda, not about ERIC, just a good way to kick off the Memorial Day weekend (what's a weekend?).

I hope many of you can make it. Can you please let me know if you'd like me to send the invitation to a personal email address, and if there are any others (in your office, in another state) you think I should also reach out to. We want this to be as inclusive as possible, and see as many faces as we can. I'll send a zoom invitation early next week.

Best,
David

David J. Becker | Executive Director and Founder
Center for Election Innovation & Research
1120 Connecticut Avenue NW, Suite 1040, Washington, DC 20036
(202) 550-3470 (mobile) | dbecker@electioninnovation.org
www.electioninnovation.org | @beckerdavidj

65.     This type of email and planning is atypical of someone who is not involved with an organization, let alone someone who has anything less than a significant managerial role.

66.     While at least Becker notes Hamlin does have some involvement, its questionable as to the extent of involvement Hamlin has in running the organization.

## VI.  CEIR's Unlawful Partisan Political Activities

67.     In September 2020, CEIR received $70 million from the Priscila Chan and Mark Zuckerberg Foundation ("Zuckerbucks"). Just days later, CEIR launched its "Voter Education Grant Program."

### i.   It is a statistical impossibility that CEIR allocated its funds in a non-partisan manner.

68.     CEIR's Voter Education Grant Program was anything but educational: it was a partisan mission to inject capital into swing states and states within then-Democratic candidate Joseph Biden's reach.

69.     Specifically, in total, CEIR reported distributing $64 million in grants to fund this alleged "urgent voter education assistance" in twenty-three (23) different states as reflected below:

70.

| State | Net Grant Amount | State | Net Grant Amount | State | Net Grant Amount |
|---|---|---|---|---|---|
| Arizona | $ 4,788,444 | Michigan | $ 11,939,365 | South Carolina | $ 1,071,797 |
| Connecticut | $ 2,100,000 | Minnesota* | $ 1,500,000 | Vermont | $ 312,615 |
| DC | $ 811,835 | Missouri | $ 1,129,391 | Washington | $ 405,000 |
| Florida | $ 287,454 | New Jersey | $ 6,180,001 | **Total** | **$ 64,260,747** |
| Georgia | $ 5,591,800 | New Mexico* | $ 768,748 | | |
| Illinois | $ 2,762,777 | New York* | $ 5,000,000 | | |
| Iowa* | $ 1,075,000 | North Carolina | $ 1,141,241 | | |
| Kentucky | $ 1,600,000 | Ohio* | $ 1,128,090 | | |
| Maryland | $ 575,000 | Pennsylvania* | $ 13,260,000 | | |
| Massachusetts | $ 200,000 | Rhode Island* | $ 632,189 | | |

\* Final grant amount pending. Any unspent funds are to be returned, reducing the total grant.

71.     These amounts were not random. Mathematical and statistical analyses reveal that the allocation of grant money was influenced by Becker partisanship and left-leaning objectives.

72.     Specifically, a chi-square test was conducted to determine whether there is a statistically significant association between the amount of grant funding CEIR distributed to swing states and the partisanship of those states.

73.     The first part of this process involves separating the states that CEIR funded into the following categories: (1) **Swing states**: Highly competitive election outcome; (2) **Biden-won states**: States that leaned consistently towards Biden; and (3) **Trump-won states**: States that leaned consistently towards Trump.

74.     The observed distribution of net grant amounts revealed the following totals across these three categories:

|  |  |
|---|---|
| Biden-won states | **$21,256,215** |
| Swing states | **$37,371,334** |
| Trump-won states | **$8,095,188** |

75.     These observed amounts show a substantial concentration of funds in swing states, which received nearly 1.8 times more funding than Biden states and more than 4.6 times more funding than Trump states.

76.     If the distribution of grant funds were neutral and non-partisan the total funds ($66,722,737) to be evenly distributed ($22,240,910) across the aforesaid three categories.

77.     These expected values represent the baseline of what would be expected if funding was distributed without bias or favoritism toward a particular category of states.

78.     However, the chi-square analysis revealed a chi-square statistic of 10,458,755.98 and a p-value of 0.00000, which indicating an extremely high level of statistical significance that the funding allocations were not accidental.

79.     In statistical terms, a p-value of 0.0 means that the probability of observing such a disparity in grant distributions by random chance alone is virtually zero.

80.     The statistically improbable, extreme concentration of funds toward swing states—particularly those that were pivotal in the 2020 election—means a deliberate strategy to allocate more resources to where the election outcome was uncertain is almost 100% certain.

81.     The significant funding disparity shows that grant allocation was not merely a function of general election administration support but rather an effort to target and influence the voter base in states critical to the election's outcome.

82.     The chi-square analysis demonstrates a statistically significant bias in grant distribution favoring swing states in the 2020 election.

### ii.   CEIR used funds to target voters to vote Democrat.

83.     CEIR's partisan activity became even more apparent when a discrepancy between the use of funds allocated to the states revealed the true nature of how Becker expended millions in just one state alone.

84.     In Michigan, for example, Becker gave Secretary of State Jocelyn Benson roughly $11.9 million for what Becker and CEIR reported as "urgent voter educational assistance."

85.     No educational component was attached to, or resulted from, these funds. Rather, Secretary Benson handed the money off to Michigan's Center for Election Law and Administration ("MCELA"), and the MCELA spent $11.7 million on Democratic consulting firms for "media strategy and purchase."[16] MCELA's 2020 public disclosures reveal $11.7 million (of the total $11,939,365.00) received were paid to two (2) Democratic consulting firms for "**media strategy and purchase.**"

86.     The consulting fees reportedly paid for television and radio ads encouraging citizens to vote as well as targeted text messages sent directly to voters who had not voted yet.

---

[16] MCELA's 2020 public disclosures reveal that $11.7 million of the total $11,939,365.00 from CEIR was spent on Waterfront Strategies ($9.7 million) and on the consulting firm of former Democratic National Committee (DNC) political director Jill Alper, Alper Strategies ($2 million).

87.     These targeted text messages were sent to registered Democrats and the contact information was provided by Waterfront Strategies and Alper Strategies, further showing the partisan nature of the "educational" grant funds.

88.     Another example of CEIR's partisan activity is evidenced in Wisconsin, a state to which CEIR and the Center for Technology and Civic Life ("CTCL") acted in concert as a *de facto* joint venture to engage in illegal activity.

89.     In March 2022, Wisconsin Special Counsel, Michael Gableman[17], published the Second Interim Investigative Report on the Apparatus & Procedures of the Wisconsin Elections System and stated in pertinent part:

> CTCL and CEIR are Zuckerberg-Chan financed entities that worked together as a joint venture in the 2020 election . CTCL funded the $8.8 million Wisconsin Safe Voting Plan (WSVP), which the cities of Milwaukee, Madison, Green Bay, Racine and Kenosha used to purchase illegal drop boxes and **the provision of those funds constitutes election bribery under Wis. Stat. § 12.11**.[18]

90.     CEIR's role in this joint venture to commit election bribery in violation of Wisconsin law was spearheaded by, of course, none other than Defendant Becker, who developed the Election Officials Legal Defense Network ("EOLDN"), a coordinated effort to legally defend state officials who committed election-related crimes not only in Wisconsin, but nationwide.[19]

91.     Boiled down to its essence, the millions Zuckerberg paid CEIR that, in turn, CEIR disguised as "grants" to swing states effectively turned otherwise objective state governmental offices into satellite hubs for the Biden campaign.

//

//

---

[17] Michael Gableman is also a former Justice of the Wisconsin Supreme Court.
[18] 18 *See generally*, Office of the Special Counsel. Second Interim Investigative Report on the Apparatus & Procedures of the Wisconsin Elections System, available at: https://citizenag.link/7e4fc8 ("Gableman Report") (emphasis added).
[19] *Id.*

**VII.  Contrast between ERIC's Activity and its Mission Statement**

92.     As stated above, ERIC's stated mission is to "assist states in improving the accuracy of America's voter rolls and increasing access to voter registration for all eligible citizens," thereby defining its scope of work.[20] These two objectives are also the basis upon which the IRS granted ERIC its tax-exempt status.

93.     Not only does ERIC operate far beyond these two stated, specific objectives, but it fails to achieve either.

  **i.  ERIC Does not improve accuracy of America's voter rolls**

94.      No evidence exists that shows ERIC improves voter roll accuracy. In fact, over a decade's worth of evidence demonstrates precisely the opposite.

95.     Despite claiming ERIC's mission in part is to "assist states in improving the accuracy of [their] voter rolls", **ERIC's success rate in removing ineligible voters from voter rolls an abysmal 1.9%.**[21]



---

[20] The U.S. Election Assistance Commission published data from the 2020 Election Administration and Voting Survey ("EAVS") (emphasis added).
[21] The phrase "[m]aintaining accurate voter rolls means nothing more than ensuring a given voter roll does not contain the names of ineligible voters, regardless of the reason underlying the basis of ineligibility.

96.     Of course, a 1.9% success rate draws skepticism upon both the calculations and data relied upon in arriving at such a low figure, as well as concerns regarding why an organization is so spectacularly incapable of accomplishing its objectives; however, there is a simple explanation: **ERIC *does not want to* improve voter roll accuracy.** It just wants access to its member states' data, and "improving voter roll accuracy" is the pretextual justification it relies upon to obtain it.

97.     Perhaps the greatest indicator that ERIC does **not** want to improve voter roll accuracy is the fact that its membership agreement expressly prohibits states from providing it with any information concerning the citizenship of its residents. More specifically, ERIC's membership agreement states:

> Under no circumstances shall the Member transmit an individual's record where the record contains documentation or other information **indicating that the individual is a non-citizen of the United States**.

98.     In America, an "eligible voter" need be three things: (1) over the age of 18; (2) a citizen of the United States; and (3) not a convicted felon or mentally incompetent. Yet of these three qualifications—one of which (age) cannot be controlled—ERIC has gone so far as to **prohibit** its member states from informing it whether the individuals residing within its state borders are or are not American citizens.

99.     At first glance, it appears ERIC is prohibiting states from sending ERIC any information about non-citizens who live in its member states. If this were true, that would give rise to an inference that ERIC is trying to avoid receiving information about non-citizens who, in turn, could possibly end up on a given member state's voter roll.

100.    But that is not the case. In closely reading the aforesaid provision, it is clear that ERIC does not prohibit member states from sending it information about illegal aliens; it just

requires the states to remove the evidence demonstrating that the names of all illegal aliens living in the member state is extracted prior to transmitting the data.

101.    In other words, ERIC simply does not want to get caught with evidence in its possession that proves ERIC knew or should have known that it was adding illegal aliens to our nation's voter rolls in direct violation of the Article I citizenship requirement.[22]

102.    ERIC does not want citizenship-related information because it is a crime to vote as an illegal alien, and ERIC facilitates the commission of these crimes.

103.    You may be asking, "Why does ERIC want data concerning illegal aliens anyways?" If so, you are not alone.

### ii.  ERIC does not increase "access" to voting registration nor does it do so exclusively for "eligible citizens"

104.    Increasing "access to voter registration" necessarily excludes those who are already registered to vote, or those who are being registered to vote automatically, unless an individual affirmatively "opts out" from being registered, as is the case in Michigan.

105.    ERIC can hardly say it seeks to increase access to voting registration "**for eligible citizens**," which is the language used in its mission statement and its application for tax-exempt status.

106.    Likewise, ERIC also Does not fight to "increase "access" to voting registration.

107.    ERIC and CEIR's virtually indistinguishable efforts go so far as to pressure state legislatures to pass legislation that changes how citizens register to vote.

108.    ERIC has also engaged in intentional and knowing violations of the Driver's Privacy Protection Act.

---

[22] *See* U.S. const. Art. I; *see also* amends. XV, IX, XXIV, and XXVI.

109.   For example, in Michigan, in order to become a registered voter, eligible but not registered" voters ("EBUs") needed to affirmatively register themselves. This was usually done at the DMV when someone moves into the state or needs to obtain a state-issued identification card.

110.   Under the policy ERIC sought to have implemented in Michigan, **those who did nothing would automatically be registered,** and only those who took affirmative action and declined to register would be omitted from state voter rolls, *even if you had already affirmatively declined to register at the DMV.*

111.   Becker was successful in his endeavor to implement this policy, as the Michigan legislature passed a law in December 2018 that brought this perversion of voter registration laws to life.[23]

112.   Nine months later, in September 2019, Michigan's Secretary of State, Benson, unilaterally expanded automatic voter registration ("AVR") also "include mail-based transactions" (e.g., mail-in ballots) by way of executive fiat.

113.   Benson then again expanded AVR again in September 2020 by sending a mailer to tens of thousands of Michiganders informing them that **they had to act if they wanted to remain <u>unregistered</u> to vote**. A copy of that mailer is included below:


[Remainder of Page Intentionally Blank]

---

[23] Section 168.491a.



114.    Benson even sent this mailer to those who previously had affirmatively declined to register, effectively conveying that the choice to not vote did not matte*r*:

115.    In sum, any Michigander who wished to maintain their fundamental right to privacy and not have their names or personally identifiable information publicly available on statewide databases, such individuals were now required to affirmatively take the steps to maintain their privacy interests, without conditions precedent thereto. Perhaps unsurprisingly, Benson has never proffered any statutory or constitutional authority that authorized her to make this unilateral and radical change to the rights of Michigan voters.[24]

---

[24] Secretary Benson's expansion of AVR is akin to someone living in a gated community that has a "no solicitation" sign posted at the entry gate. Despite already advising that solicitation is unwanted, you must get up, answer the door, and tell the solicitor that solicitation is unwanted. But should you fail to do so, the silence is construed to mean solicitation is invited, and your prior decision to not register to vote was of no importance.

116.     The graphic below demonstrates the impact on voter registration that occurred just thirty (30) days after Benson's quasi-dictatorial policy was instituted:



### iii.  ERIC decreases access to voter registration.

117.     Not only are 501(c)(3) approved organizations like ERIC prohibited from engaging in this type of extensive lobbying, even if this lobbying were permissible, ERIC is not acting within the scope of its stated purpose of "increasing access" to voter registration. Indeed, there can be no "access" to register to vote if those who need such access have already been registered.

118.     Conveniently, Benson just so happened to have made the second and final AVR amendment to Michigan's voting laws only days before she received a grant in the amount of $12,000,000.00, from ERIC.

119.     Since its founding in 2016 through September 2020, CEIR had never previously issued a single grant, yet just two (2) months before the 2020 presidential election, CEIR issued more than $64,000,000.00 in grants and every penny of which lined the pockets of the top election officials or partisan political consultants in the election's most influential swing states.

120.     **ERIC's own statistics show that it adds about ten times (10x) the number of voters to voter rolls than the number of ineligible voters it removes**, despite the fact that adding

voters to voter rolls is not even part of ERIC's mission or the purpose upon which the IRS granted ERIC its tax-exempt status.  The below graph is a visual as to the disproportionate allocation of funds, time and energy ERIC spends on adding voters to voter rolls (blue) in comparison to the removal of ineligible voters (green and orange):



**VIII.  ERIC Knowingly Discloses Personal Information from Driving Records to CEIR**

121.    To review, fully-aware that ERIC's partisanship and lobbying activity could cause it to lose its tax-exempt status, Becker founded a second nonprofit, the CEIR, to bifurcate his political activities. ERIC receives and collects state resident data, while CEIR receives all non-member state dues funds. ERIC then transmits the data it receives from the states to CEIR, which, in turn, creates mailing lists and consolidates the data into a format conducive to outreach efforts and sends back to ERIC, which, in turn, returns the data to its member states, complete with new EBU's and a handful of ineligible voter labels affixed thereto. CEIR then begins contacting the voters and pushing for them to register as voters, and ERIC appears as though it produced data that helps its member states identify ineligible voters for removal in addition to providing labels that identify which voters are EBUs in the state.

122.    In the event funding becomes a crucial component, earmarked contributions are sent to CEIR, who then issues grant money to the member states' top elections officials where the *quid pro quo* is understood that the state will not only comply with all terms of the ERIC member agreement, but also execute the initiatives and agenda ERIC/CEIR, which, in 2020, were the inflation of voter roll registrations and legislative amendments that make it easy to add more voters to county voter rolls.

123.    On September 4, 2020, just three days after CEIR received $70,000,000.00 from Zuckerberg, CEIR's then-former research manager, Jenny Lovell, sent an email to numerous state officials admitting that ERIC transmits state-controlled data to CEIR.

124.    The data referenced in her email is **not** voter data; it is personal information from driving records obtained from ERIC's member-states and non-member, the State of Wisconsin's DMV. This personal information is what ERIC uses to identify persons ERIC labels as "EBU's":



*Email from Jenny Lovell with CEIR's "@electioninnovation.org" email handle*

125.    Substantively, Lovell's email makes clear that personal information from driving records—the EBU data—must be sent to ERIC, **not** CEIR, in hopes of avoiding production of such an email in the event CEIR were to face litigation.

126.    Due to the scheme to avoid the appearance of engaging in partisan activity and lobbying, data sent directly to CEIR could be fatal if uncovered.

127.    Lovell then concludes that ERIC would again serve as the pass-through conduit for both receiving and returning the data the member-state that the state and CEIR never have any communication with one another.

128.    Another document that evinces ERIC's transmission of DMV data to CEIR is the "EBU General Timeline" published after CEIR received the $70M in funding from Zuckerberg.

---

**EBU General Timeline**
1. The state notifies their mailing service that there will be two rounds of mailers.
2. The state receives the EBU list from ERIC.
3. The state does any internal cleaning and processing that it deems necessary.
4. The state uploads the cleaned EBU list to the ERIC SFTP site, and ERIC securely transfers it to CEIR.
5. CEIR completes a randomization process. This process will produce two lists. The first list will be a small control group. The second, much larger list will receive the first round of mailers (this is the "treatment group").
   - If your state is sending out two different mailers, you will get four lists—one control group and one treatment group for mailer A, and one control group and one treatment group for mailer B.
6. CEIR shares the lists with the state (via ERIC).
7. The state shares the lists with their mailing service.

---

129.    This timeline is a flagrant violation of well-established federal laws that govern both the elections process as well as data privacy regulations, as explained in greater detail below.

## IX.  ERIC Exploits its Tax-Exempt Status

130.    ERIC exists to obtain DMV data, bloat voter rolls, and facilitate mass voter registration, yet ERIC's true purposes were state on its Form 1023 filing that was submitted to obtain tax-exempt status under Section 501(c)(3) of the Internal Revenue Code ("IRC").

### i.  ERIC operates for non-exempt purposes outside its exempt purpose

131.    Organizations that operate for substantial non-exempt purposes are not entitled to tax-exempt status.[25]

---

[25] 26 CFR § 1.501(c)(3)-1(d)(1)(ii)).

132.    For already-approved tax-exempt organizations, engaging in activities outside the scope of the organization's stated exempt purpose is prohibited and gives rise to a basis under which the IRS can revoke the organizations tax-exempt status. This is one such case.

133.    ERIC's exempt purpose is to "assist states in improving the accuracy of America's voter rolls and increase access to voter registration for all eligible citizens." As explained in great detail, above, ERIC does *not* improve accuracy of America's voter rolls, nor does it increase access to voter registration for eligible citizens.

134.    ERIC's member states have statistically less accurate voter rolls than do the states who do **not** belong to ERIC (see above). Moreover, **ERIC's own membership agreement explicitly prohibits its member states from providing it with information concerning citizenship**. It is impossible that ERIC can produce accurate voter rolls when it goes out of its way to prohibit receiving information about whether a member state resident is an American citizen and, thus, an eligible voter.

135.    Indeed, citizenship is a material, outcome-determinative variable and it is objectively impossible for ERIC to produce accurate voter rolls without knowing whether the names of persons contained in the data it receives are, or are not, Americans.

136.    Despite not knowing who is, or who is not, an American citizen, ERIC still requires its member states to contact every person on the list and, in no event, less than 95% of the names it provides the states:

> a. When the Member receives ERIC Data regarding eligible or possibly eligible citizens who are not registered to vote, the Member shall, at a minimum, initiate contact with each and every eligible or possibly eligible citizen and inform them how to register to vote. Each Member shall have until October 1 or fifteen (15) days before the close of registration, whichever is earlier, of the next Federal General Election year to initiate contact with at least 95% of the eligible or

137.    As discussed above, ERIC obtains and receives information from eligible and ineligible voters, both of which appear on state voter rolls.

138.    Illegal aliens appear on voter rolls because of ERIC and the data it provides to the states.

139.    The resultant impact of ERIC requiring 95% outreach to a list of names despite not knowing whether anyone is or is not a citizen is perhaps best highlighted in the testimony offered by Colorado's Deputy Secretary of State:

140.    In July 2024, Deputy Secretary of State Christopher Beall testified under oath that because of ERIC's list maintenance practices (or lack thereof), ERIC provided Colorado a list of 50,000 "eligible but unregistered" names for the State to contact and encourage to vote, yet 30,000 of those names were illegal aliens who cannot register or vote lawfully in this country.

141.    Furthermore, ERIC's membership agreement does not require member states to remove ineligible voters. The only situation where an "obligation" to remove ineligible voters occurs is if a member state independently validates the data it provides to ERIC.

142.    In other words, ERIC does not mandate that its member states remove ineligible voters. It only requires removal if the state itself confirms the ineligibility of the voter through its own verification process.

## X.  ERIC Knowingly Violates the DPPA and Has Done So for the Last Eight Years

143.    ERIC has intentionally and knowingly violated the DPPA for over eight (8) years.

144.    On August 15, 2024, an open records request was submitted to the State of Wisconsin for "an electronic copy of the membership agreement between the State of Wisconsin and the Electronic Registration Information Center (ERIC) . . . to understand the terms under which Wisconsin participates in ERIC."[26]

---

[26] *See* <u>Exhibit 2</u>, Open Records Request & Response E-Mail Chain dated Aug. 15, 2024.

31

145.    On August 16, 2024, the State of Wisconsin acknowledged receipt of the open records request and produced **one copy of one document** that it said governs "the terms under which Wisconsin participates as a member in ERIC."[27]

146.    The documents shows that on May 17, 2016, the Wisconsin GAB entered into a contractual agreement with ERIC under the guise that ERIC would help Wisconsin "reduce the costs and increase the accuracies and efficiencies associated with Wisconsin's use of voter registration systems"[28] in exchange for a $25,000.00 payment, tens of thousands worth in annual "membership dues", and unfettered access to Wisconsin's DMV database. ("Agreement").

147.    GAB and ERIC were the only two parties to the Agreement.

148.    Wisconsin did not produce an amended agreement, a subsequent agreement, or any documentation that reveals ERIC gave GAB written consent to assign its rights or interests as required under the Agreement's Assignment Clause.

149.    Therefore, from May 17, 2016 through June 30, 2016, neither Party amended the Agreement or its terms, nor did GAB transfer any of the rights or interests it had pursuant to the terms of the Agreement.

150.    For 44 days, this Agreement remained in place until it was terminated on June 30, 2016, when GAB was eliminated by the 2015 Wisconsin Act 118.[29]

151.    The only manner in which the Agreement could have remained in effect beyond June 30, 2016 was if ERIC provided GAB written consent to assign its rights and interests to another party or entity.

---

[27] *Id.*; *see also* Exhibit 1.
[28] *See* Exhibit 1, Original Agreement dated May 17, 2016; *see* Exhibit 3, Declaration of Eric Scharfenberger.
[29] 2015 Wisconsin Act 118 Memo, WISCONSIN LEGISLATIVE COUNCIL (Dec. 22, 2015), available at: https://docs.legis.wisconsin.gov/2015/related/acts/118.pdf.

152.   ERIC never tendered such permission in writing or otherwise and there are no subsequent agreements between Wisconsin and ERIC.

153.   Therefore, any contractual relationship between Wisconsin and ERIC ended over eight (8) years ago on June 30, 2016.

154.   Despite being fully-aware that Wisconsin's contract with ERIC ended over 3,000 days ago June 30, 2016, and Wisconsin has never re-joined ERIC since, ERIC has continued to demand Wisconsin fork out hundreds of thousands of dollars comprised of taxpayer and federal money for "membership dues."

155.   Even worse, ERIC has demanded that Wisconsin provide it with the State's DMV data in blatant violation of the DPPA, and ERIC has been successful in obtaining personal information from driving records.

156.   ERIC has then itself violated the DPPA not only by receiving the DMV data while not authorized to be in possession of such information, but by disclosing it without authorization to its counterpart, the CEIR.

157.   Boiled down to its essence, Wisconsin has not been an ERIC member-state for almost a decade, but it continued paying hundreds of thousands of taxpayer dollars for "membership dues" to ERIC, while providing protected DMV data in violation of the DPPA—and absent the injunctive relief sought in this action, Wisconsin will continue to do so in violation of federal law.

**<u>FIRST CLAIM FOR RELIEF</u>**
**Violation of the DPPA, 18 U.S.C. § 2721 *et seq.***
**(*Against All Defendants*)**

158.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

159.    The Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq.*, prohibits any person or entity from knowingly obtaining, disclosing, or using personal information derived from motor vehicle records for any purpose not explicitly authorized under 18 U.S.C. § 2721(b).

160.    To establish a violation of the DPPA, Plaintiffs must demonstrate that Defendants (1) knowingly obtained, disclosed, or used personal information; (2) that was sourced from motor vehicle records; (3) for a purpose not permitted by the statute. *See McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015).

161.    Becker, ERIC, and CEIR knowingly obtained and used personal information from Wisconsin's DMV database after the termination of the original membership agreement with Wisconsin on June 30, 2016. At all times relevant, Defendants were aware and otherwise knew that they lacked any legal authorization to continue accessing this data, yet they knowingly persisted in obtaining, disclosing, and using personal information from driving records for unauthorized purposes, including partisan voter outreach. This conduct demonstrates Defendants' known and intentional disregard for the legal protections provided by the DPPA.

162.    The DPPA enumerates fourteen (14) permissible uses for personal information obtained from motor vehicle records, which include government use for safety, theft, and emissions control, and civil litigation. *See* 18 U.S.C. § 2721(b). Voter outreach, political targeting, and any election-related activities are not among these authorized uses.

163.    Defendants' use of Wisconsin DMV data for voter registration and outreach activities is not authorized by any of the permissible uses specified in the statute.

164.    The DPPA further protects "Highly Restricted Information" (HRI), which includes names, addresses, social security numbers, driver's license numbers, phone numbers, photographs, dates of birth, and vehicle registration information.

165.    Defendants knowingly obtained and disclosed Ms. McKinney's personal information or HRI without authorization, in direct violation of 18 U.S.C. § 2721(a) and 18 U.S.C. § 2725(4). This unauthorized use of HRI exacerbated the harm to Plaintiffs, increasing the risk of identity theft, privacy invasion, and unauthorized political targeting.

166.    David J. Becker knowingly obtained personal information that was sourced from motor vehicle records.

167.    Knowing that the personal information was sourced from motor vehicle records, David J. Becker then used the personal information for one or more purpose(s) not permitted by the statute, including, without limitation, providing the information to CEIR, targeting citizens unregistered to vote, targeting non-citizens who are not registered to vote, bloating voter rolls, adding non-citizens to voter rolls, and soliciting donations.

168.    The Electronic Registration Information Center knowingly obtained personal information that was sourced from motor vehicle records.

169.    Knowing that the personal information was sourced from motor vehicle records, ERIC then used the personal information for one or more purpose(s) not permitted by the statute, including, without limitation, providing the information to other Secretaries of States, providing the personal information to the CEIR targeting citizens unregistered to vote, targeting non-citizens who are not registered to vote, bloating voter rolls,  adding non-citizens to voter rolls, and soliciting donations.

170.    The Center for Election Innovation and Research knowingly obtained personal information that was sourced from motor vehicle records.

171.    Knowing that the personal information was sourced from motor vehicle records, the CEIR then used the personal information for one or more purpose(s) not permitted by the statute, including, without limitation, providing the information to other Secretaries of States,

targeting citizens unregistered to vote, targeting non-citizens who are not registered to vote, bloating voter rolls,  adding non-citizens to voter rolls, and soliciting donations.

172.    The Wisconsin Department of Transportation, by and through its Division of Motor Vehicles ("DOT")  knowingly disclosed personal information that was sourced from motor vehicle records to Becker, ERIC, and CEIR and no lawful basis justifying this disclosure exists for doing so.

173.    Citizen AG has suffered concrete injuries as a direct result of Defendants' unlawful conduct, in that Citizen AG was forced to divert significant resources from its regular programmatic activities, including election monitoring and compliance initiatives, to investigate and counteract Defendants' unauthorized use of DMV data. This diversion of resources has impaired Citizen AG's ability to fulfill its mission and has caused financial and operational burdens.

174.    Ms. McKinney, a Wisconsin voter, has suffered concrete injuries as a direct result of Defendants' unlawful conduct, in that she experienced an invasion of privacy due to the unauthorized access, use, and disclosure of her DMV data, which was used and continues to be used to infringe upon and violate her fundamental right to privacy and has undermined her fundamental right to vote, which is an irreparable harm.

175.    Defendants' unauthorized actions in obtaining, disclosing, and using Plaintiffs' personal information were the direct and proximate cause of Plaintiffs' injuries. These injuries were foreseeable consequences of Defendants' intentional and willful violations of the DPPA. Had Defendants complied with the DPPA, Plaintiffs would not have suffered the diversion of resources, loss of privacy, or dilution of voting rights.

176.    Defendants' unlawful conduct under the DPPA is not limited to past actions but continues to the present. Defendants have engaged in, and will continue to engage in the ongoing

unauthorized disclosure and use of personal information obtained from driving records, which were disclosed by WisDOT absent injunctive relief sought herein. Plaintiffs face continued harm if Defendants are not enjoined from further violating the DPPA.

177.    Under 18 U.S.C. § 2724(b), Ms. McKinney is entitled to statutory damages of $2,500 for each violation of the DPPA. Given the scale of the unauthorized access and disclosure, Ms. McKinney seeks a calculation of damages based on the number of violations occurring since June 30, 2016, with punitive damages requested to address Defendants' willful and reckless disregard for Plaintiffs' privacy and voting rights.

178.    Plaintiffs seek injunctive relief prohibiting Defendants from further accessing, using, or disclosing any personal information derived from WisDOT DMV records. Plaintiffs further request that Becker, ERIC, and CEIR be ordered to return or destroy all DMV data unlawfully obtained, in compliance with the DPPA's requirements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and further grant:

(A)    Declaratory relief holding, as a matter of law, that WisDOT has no valid membership agreement with ERIC and the membership agreement between Wisconsin and ERIC terminated upon the elimination of the GAB on June 30, 2016;

(B)    Declaratory relief holding, as a matter of law, that ERIC, the CEIR, Becker, and WisDOT violated the Driver's Privacy Protection Act by knowingly obtaining, disclosing, and using personal information from driving records for purposes other than the fourteen (14) permitted uses expressly provided in the text of the DPPA statute;

(C)     Temporary and preliminary injunctive relief enjoining WisDOT, ERIC, the CEIR, and Becker from obtaining, disclosing, and using personal information from driving records for voting or election-related purposes;

(D)     Permanent injunctive relief that enjoins WisDOT, ERIC, the CEIR, and Becker from obtaining, disclosing, and using personal information from driving records stored by the Wisconsin Department of Transportation's DMV for any and all voting or election-related purposes;

(E)     Award statutory liquidated damages to Ms. McKinney in the amount of $2,500 for each violation of the DPPA involving Ms. McKinney's personal information since June 30, 2016;

(F)     Award punitive damages to address Defendants' knowing, willful and reckless disregard for the legal protections under the DPPA and the privacy and voting rights of Wisconsin residents;

(G)     Award attorneys' fees, costs, and expenses pursuant to 18 U.S.C. § 2724; and

(H)     Award any other relief that this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 28, 2024.

Respectfully submitted,

*/s/ Rachel Dreher*
Rachel Dreher
CITIZEN AG
111 NE 1st St, 8th Floor
Miami, FL 33132
Tel: (202) 595-4504
rachel@citizenag.org

*Counsel for Plaintiffs*