IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

1789 FOUNDATION, INC. d/b/a CITIZEN AG and
JENNIFER MCKINNEY,

         Plaintiffs,        OPINION AND ORDER

  v.                   24-cv-755-wmc

ELECTRONIC REGISTRATION INFORMATION
CENTER and DAVID J. BECKER, in his individual
and official capacities,

         Defendants.

---

Plaintiffs 1789 Foundation, Inc. d/b/a Citizen AG ("Citizen AG") and Jennifer McKinney sued defendants Electronic Registration Information Center ("ERIC") and David Becker under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721–25, claiming that ERIC and Becker obtained information from the Wisconsin Department of Transportation ("DOT") about licensed Wisconsin drivers, then used that information unlawfully, including to "bloat" voter rolls and conduct partisan activities.[1]  Defendants have moved to dismiss the entire complaint for lack of standing and failure to state a claim under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), respectively.  (Dkt. #20; Dkt. #35.) Defendants have also moved for sanctions against plaintiffs and plaintiffs' counsel.  (Dkt. #40; Dkt. #59.)  For the reasons stated below, defendants' motions to dismiss and for sanctions will be granted.

---

[1] Becker is the executive director of the Center for Election Innovation and Research ("CEIR"), which was originally named as a defendant, along with the DOT.  However, plaintiffs voluntarily dismissed CEIR and DOT as defendants.  (Dkt. #26; Dkt. #27.)

ALLEGATIONS OF FACT[2]

Plaintiff Citizen AG is a Florida nonprofit organization reportedly focused on "educating Americans about their rights" and "advocating, protecting, and preserving American civil liberties and constitutional rights through an array of means that include, without limitation, public records requests and litigation."  (Dkt. #1, ¶ 4.)  Plaintiff McKinney is a registered Wisconsin voter who lives in La Crosse County.  (*Id.*, ¶ 13.)[3]  In turn, defendant ERIC, a Washington D.C. nonprofit organization, describes itself as "a membership organization consisting of state election officials working together to improve the accuracy of state voter registration lists."  (*Id.*, ¶ 13.)  CEIR is also a Washington, D.C. nonprofit and states its purpose is "support[ing] state election officials in enhancing the accuracy of voter registration lists."  (*Id.*, ¶ 19.)  Finally, defendant Becker is the founder of ERIC and CEIR, as well as the current executive director of CEIR.

On August 15, 2024, Citizen AG submitted an open-records request to the Wisconsin Elections Commission ("WEC") seeking "an electronic copy of the membership agreement between the State of Wisconsin and [ERIC] . . . to understand the terms under which Wisconsin participates in ERIC."  (*Id.*, ¶ 144; dkt. #1-7.)  WEC responded the following day by attaching both a copy of the original membership agreement, dated May

---

[2] The following allegations are drawn from plaintiffs' complaint and accepted as true for purposes of resolving defendants' pending motions to dismiss.  *McCray v. Wilkie*, 966 F.3d 616, 618 (7th Cir. 2020).

[3] Plaintiffs do not allege that McKinney is a member of Citizen AG, but her counsel represents that she is in her brief in opposition to ERIC's motion to dismiss.  (Dkt. #30 at 3.)  For purposes of resolving the pending motions, the court will assume McKinney is a member of Citizen AG.

17, 2016, and the agreement currently in place, as well as advising that the most current version of the agreement and bylaws could be found on ERIC's website.  (Dkt. #1-7.)

The original membership agreement was between ERIC and Wisconsin's Government Accountability Board ("GAB"), which was statutorily replaced by WEC shortly after the agreement's execution.  In fact, at the time of executing the original agreement, ERIC and GAB had even agreed that WEC would take GAB's place. Specifically, Kevin Kennedy, the director and general counsel of GAB, signed the agreement on behalf of "Wisconsin Government Accountability Board/Wisconsin Elections Commission," and the signature page included a note stating, "Effective June 30, 2016[,] the Wisconsin Government Accountability Board becomes the Wisconsin Elections Commission."  (Dkt. #1-6, signatures at 8.)  Further, a few months before the membership agreement was even signed, the bill creating WEC also clarified that "[a]ll contracts entered into by the government accountability board that are in effect on the effective date of this subsection shall remain in effect and are transferred to the elections commission."  Wis. Stat. § 266(5).  Thus, as of June 30, 2016, and going forward, the membership agreement was between ERIC and WEC.

In addition, the original membership agreement provides that GAB/WEC will become a member of ERIC and pay annual dues for ERIC's services.  (Dkt. #1, ¶ 146; Dkt. #1-6, Preamble at 1.)  As part of those express services, GAB would then transmit to ERIC specified data related to its voter files and motor vehicle records (collectively, the "Member Data").  (Dkt. #1-6, § 2.)  This specified data is to consist of:

> (1) all inactive and active voter files *(excluding those records that are confidential or protected from disclosure by law)*, including those fields identified in Exhibit B, and (2) all licensing or identification records contained in the motor vehicles database *(excluding those fields unrelated to voter eligibility*, such as fields related to an individual's driving record), including those fields identified in Exhibit B.

(*Id.,* § 2.b) (emphasis added).[4]   More granularly, Exhibit B of the original agreement specifies that GAB/WEC will submit the following "Voter Registration and motor vehicles data fields":

1.    All name fields
2.    All address fields
3.    Driver's license or state ID number
4.    Last four digits of Social Security number
5.    Date of birth
6.    Activity dates as defined by the Board of Directors
7.    Current record status
8.    Affirmative documentation of citizenship
9.    The title/type of affirmative documentation of citizenship presented
10.    Phone number
11.    E-mail address or other electronic contact method

(*Id.,* Exhibit B at 9.)

The agreement also requires GAB/WEC to transmit "data relating to individuals that exists in the records of other agencies within its jurisdiction that perform any voter

---

[4] Plaintiffs allege that the agreement gave ERIC "unfettered access to Wisconsin's DMV database" (dkt. #1, ¶ 146), but this allegation is neither consistent with the actual agreement plaintiffs submitted, nor need the court accept it as true. *See Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) ("The court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material."). Rather, the agreement specifies that members provide specified information from the DMV database to ERIC. (Dkt. #1-6, § 2(b).)

registration functions . . . ('Additional Member Data')." (*Id.*, § 3.)  ERIC is then to use this data to provide Wisconsin with reports identifying individuals who have moved to a different state or within the state; registrants who have died; voters with duplicate registrations; and possible cases of illegal voting.  Additionally, ERIC generates reports identifying individuals who may be eligible to vote but remain unregistered.  "Upon receipt of ERIC Data regarding eligible or possibly eligible citizens who are not registered to vote," the agreement next requires GAB/WEC to contact those citizens "and inform them how to register to vote." (*Id.,* § 5.a.)  It further requires GAB/WEC, upon receipt of "credible ERIC Data (meaning the state has validated the data) indicating that information in an existing voter's record is deemed to be inaccurate or our-of-date," to contact that voter to either correct the inaccuracy, update the voter's record, or inactivate the voter's record. (*Id.,* § 5.b.)

Finally, the agreement requires ERIC and GAB/WEC to "use their best efforts to prevent the unauthorized use or transmission of any private or protected Member Data; Additional Member Data; and data included in reports provided by ERIC ('ERIC Data')." (Dkt. #1-6, § 4.a.)  Similarly, GAB/WEC must comply with all local, state, and federal laws when transmitting data to ERIC, and to use or transmit any data for no other purpose "than the administration of elections under state or federal law."  (*Id.,* § 4.a.)  If ERIC discloses any "motor vehicle data" without authorization, whether accidentally, intentionally, or via a third party, "ERIC shall immediately give notice" to GAB/WEC. (*Id.*, at § 4.d.)

OPINION

Plaintiffs' complaint is 38 pages long and includes many confusing, vague and conclusory allegations about conspiracies, as well as legal arguments and irrelevant information disconnected from Wisconsin. Ultimately, however, plaintiffs assert only one legal claim for relief sounding under the DPPA and seeking to protect against unauthorized disclosures of an individual's personal information from a driving record. 18 U.S.C. § 2724(a). More specifically, plaintiffs claim that defendants used and disclosed in violation of the DPPA McKinley's and other Wisconsin residents' personal information disclosed to them by the Wisconsin DOT. Defendants move to dismiss plaintiffs' DPPA claim for lack of standing under Article III of the United States Constitution and for failure to state a claim under the DPPA. Because constitutional standing is a threshold, jurisdictional question, the court must consider it first. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Before turning to standing, however, the court will briefly address an issue regarding the scope of plaintiffs' remaining claim.

At least in part, plaintiffs DPPA claim appears to be based on the assumption that it is unlawful for ERIC to receive *any* information from the Wisconsin DOT -- and in particular, from Wisconsin motor vehicle records -- because ERIC has no valid contract with Wisconsin. Indeed, plaintiffs acknowledge in their opposition brief that "ERIC's lack of a contractual relationship with Wisconsin is a cornerstone of this case." (Dkt. #30, at 3.) However, this argument is frivolous on its face, having been contradicted by the express terms of the original membership agreement itself that *plaintiffs* attached to their complaint. (Dkt. #1-6.) In particular, as discussed above, WEC expressly assumed and

6

accepted the obligations of Wisconsin's ERIC membership and contractual obligations after GAB was dissolved. This transfer of authority was not only contemplated in the membership agreement, but the Wisconsin Legislature by statute specifically *requires* Wisconsin to be a member of ERIC. Wis. Stat. § 6.36(ae)(1). Thus, any of plaintiffs' arguments based on a theory that the WEC had no valid, binding agreement with ERIC are meritless on their face.

## I.     Standing

To establish constitutional standing, plaintiffs must show that: (1) they suffered an injury in fact, (2) fairly traceable to defendants' challenged conduct, and (3) likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). In their motions to dismiss, defendants contend that neither plaintiff has alleged the first *or* second of the necessary elements for standing. The court considers the two plaintiffs' standing arguments independently below.

### A. Plaintiff Jennifer McKinney

In her complaint, McKinney alleges several bases to establish standing. *First*, she asserts standing under Wis. Stat. § 5.06, "insofar as Ms. McKinney is a taxpayer and Defendants are spending taxpayer money on illegal activities or funding activities." (Dkt. #1, ¶ 16.) However, that statute is irrelevant to establish either plaintiffs' standing (or even to this case more broadly), as it concerns elector complaints against "an election official" regarding "nominations, qualifications of candidates, voting qualifications,

including residence, ward division and numbering, recall, ballot preparation, election administration or conduct of elections." Wis. Stat. § 5.06(1). The term "election official" is statutorily defined as "an individual who is charged with any duties relating to the conduct of an election." Wis. Stat. § 5.02(4e). This applies to neither defendant. In addition, the law provides a state administrative process for the filing of a complaint with WEC, as well as an appeals process to a Wisconsin state court, not any federal judicial review. Wis. Stat. § 5.06(2)–(3), (8).

More generally, absent special circumstances not present here, McKinney's status as a taxpayer is not a basis for standing. In *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125 (2011), the United States Supreme Court expressly "rejected the [] proposition that an individual who has paid taxes has a "'continuing, legally cognizable interest in ensuring that those funds are not *used* by the Government in a way that violates the Constitution.'" *Id*. at 134 (citation omitted) (emphasis in original); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (a plaintiff's status as an affected taxpayer does not qualify as a concrete and particularized injury).

*Second*, plaintiffs vaguely allege that McKinney's "fundamental right to vote" has been "undermined" (dkt. #1, ¶ 174), but fail to explain why this is so, except to state early on their complaint that defendants' actions:

> burden the federal and state constitutional rights to vote of all individual members of Citizen AG who are lawfully registered to vote in Wisconsin by undermining their confidence in the integrity of the electoral process, discouraging their participation in the democratic process, instilling in them the fear that their legitimate votes will be nullified or diluted, and actually diluting their votes.

8

(*Id.*, ¶ 7.)  Throughout the complaint, plaintiffs also refer to a "bloating" of state voter rolls due to defendants' alleged actions, by which they seem to mean both large-scale voter-registration efforts (*Id.* ¶¶ 12, 45, 130) and actions to "add[] non-citizens to voter rolls." (*Id.* ¶¶ 167, 169, 171).

Here, too, federal courts have found comparable, vague theories of generalized "vote dilution" to be insufficient to establish Article III standing.  *See Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 608–09 (E.D. Wis. 2020) (collecting cases).

For example, the district court in *Feehan* itself, considered a Wisconsin voter's challenge to the results of the 2020 presidential election based on vague allegations of it being conducted so unlawfully that "Wisconsin's voters, courts, and legislators, cannot rely on" the reported results.  *Id.* at 609.  In rejecting that challenge, the district court found plaintiffs' alleged injuries were the same "that any Wisconsin voter suffers if the Wisconsin election process were [conducted as unlawfully] as the plaintiff alleges." *Id.* Thus, the court held that this type of harm was not the type of "particularized, concrete injury sufficient to confer standing." *Id.; see also Wis. Voters All. v. Pence*, 514 F. Supp. 3d 117, 120 (D.D.C. 2021) (generalized vote dilution is not a distinct, personal injury that supports standing); *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (same); *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 712 (D. Ariz. 2020) (same).

*Third*, McKinney alleges that defendants' unauthorized "use of data" increased "the risk of identity theft, privacy invasion, and unauthorized political targeting."  (Dkt. #1, ¶ 165.)  However, the allegation of a general risk of future harm is also not a concrete injury sufficient to create standing.  *Ewing v. MED-1 Solutions, LLC*, 24 F.4th 1146, 1152

(7th Cir. 2022) (risk of "information being exposed in the future" is not a "concrete injury"). Nor does "worry and anxiety" over possible harms give rise to standing. *Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 977 (7th Cir. 2023).

*Fourth* and finally, plaintiffs allege that McKinney suffered an "invasion of privacy due to the unauthorized access, use, and disclosure of her DMV data." (Dkt. #1, ¶ 174.) In their complaint, McKinney included *no* allegations of any actual, concrete injury suffered due to any alleged disclosure of her data. In fairness, McKinney did submit a declaration with her response to defendants' motions to dismiss, stating that she received unwanted messages, including "dozens of unwanted mailings, e-mails, and text messages prior to the 2024 election, up to and including as recent as November 2, 2024." (McKinney Decl. (dkt. #45) ¶¶ 8, 9.) Even if the receipt of these messages constitutes an actionable harm, however, plaintiffs fail to include *any* allegations supporting a reasonable inference that these unwanted solicitations were caused *by defendants'* actions. At most, the complaint and McKinney's declaration alleges that ERIC received personal driver's license data and disclosed it without authorization. Still, plaintiffs wholly fail to allege *how* defendants' alleged disclosures led to her receiving unwanted mailing solicitations, emails, and text messages. Again, in fairness, plaintiffs point out that McKinney flatly declares she received these communications "directly and proximately because ERIC knowingly obtained, used, and/or disclosed the personal information contained in my driving records" (*id.*, ¶ 11), but she offers no foundation or causal evidence to support her conclusory allegation. For example, McKinney does not identify any specific entity to whom ERIC purportedly disclosed information, let alone an entity that then used that information to contact her.

10

Nor does she attempt to explain *why* she believes the messages could be connected to ERIC, as opposed to some other entity that obtained her contact information. In fact, half of the messages that McKinney attached to her declaration are not even addressed to her. (Dkt. #45-1–3.) Entities or individuals that addressed her as "Israel" and "Howe" appear to have lacked access to even her name, undermining any inference that such communications came from somebody with access to her motor vehicle records.

Moreover, the court can take judicial notice of the fact that individual addresses and telephone numbers are readily available to the public or data brokers through a myriad sources, including a voting records website operated by WEC that includes "a voter's name, address, and any contact information they provided with their registration." *See* FAQ Page, Wisconsin Elections Commission Badger Voters, https://badgervoters.wi.gov/faq (last accessed April 22, 2026); Courtney Evans & Katie Bender-Olson, "Voter Information as Public Record," WIS. LEGIS. COUNCIL (Apr. 2022), https://docs.legis.wisconsin.gov/misc/lc/issue_briefs/2022/elections/voter_information_kbo _2022_04_07).[5] It is also well known that unwanted calls and text messages are ubiquitous in Wisconsin and nationwide, and that telephone numbers can be obtained from many different sources.[6] Finally, at least in Wisconsin in 2024 (as one of a few states in the

---

[5] *See Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022) (district court can take judicial notice of public information in resolving motion to dismiss).

[6] *See, e.g.,* "Unwanted Junk: Mail, Calls, Emails, Texts, Faxes," https://datcp.wi.gov/Pages/Publications/JunkMailUnwantedCalls140.aspx ("The advertising lists are compiled from many sources and then sold to the direct marketers to use in marketing campaigns."); "National Do Not Call Registry FAQs, Federal Trade Commission," https://consumer.ftc.gov/articles/national-do-not-call-registry-faqs ("One reason people get a lot of unwanted calls is because it's easy and cheap for scammers to call people anywhere in the

Union identified as "up for grabs" by both parties), one would have to be living under a rock *not* to be inundated by unwanted mailings, e-mails, and text messages before the national elections, driver's license or not.[7]

In short, McKinney's "submission boils down to an assertion that there might be a connection" between ERIC and the text messages she received. *Baysal*, 78 F.4th at 978. "Guesswork of that kind is not enough, however; the injury must be traceable to the asserted wrong and likely rather than speculative." *Id.* Thus, plaintiffs' allegations do not permit a reasonable inference that plaintiff McKinney has suffered an "injury-in-fact" traceable to defendants' conduct, meaning that she lacks standing.

### B. Plaintiff Citizen AG

In their briefs in opposition to dismissal, plaintiffs fail to address defendants' challenge to plaintiff Citizen AG's standing. Thus, it appears that plaintiffs may concede that Citizen AG lacks standing to pursue a DPPA claim. *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) ("[A] party generally forfeits an argument or issue not raised in response to a motion to dismiss.") This is understandable since presumably Citizen AG -- as a Florida-based, corporate entity -- has no driver's license or other personal

---

world."); Nik Popli, Why You Get So Many Political Campaign Texts—and What to Do About It, TIME (July 3, 2024, 10:35 AM), https://time.com/6994868/political-campaign-texts-what-to-do/.

[7] *See, e.g.,* "The 2024 Swing States: Why Wisconsin Could Sway the Presidential Election," U.S. News (Nov. 5, 2024, 5:44 p.m.), https://www.usnews.com/news/elections/articles/the-2024-swing-states-wisconsin-could-sway-the-presidential-election.

information lodged with the Wisconsin DOT.  Because plaintiffs did not expressly *concede* Citizen AG's lack of standing, nor sought to withdraw its claim, the court will briefly address the standing assertions made by Citizen AG in the complaint.

In the complaint, Citizen AG initially alleges that it has standing under Wis. Stat. § 227.40 (Dkt. 1 ¶ 17), which governs judicial review of agency "rule[s] or guidance document[s]."  Wis. Stat. § 227.40(1).  However, that statute plainly does not grant standing to Citizen AG to use here, since plaintiffs are *not* challenging a rule or guidance document.  Even if they were, "the exclusive means for judicial review" of such a challenge would be an action for declaratory judgment in state court, not federal court, since neither diversity nor federal law is at play.  *Id.*  Regardless, plaintiffs fail to explain how standing in a state administrative rule challenge claim would provide standing for Citizen AG under the DPPA.

Plaintiffs next allege that Citizen AG has standing because it "was forced to divert significant resources from its regular programmatic activities, including election monitoring and compliance initiatives, to investigate and counteract defendants' unauthorized use of DMV data, [and] [t]his diversion of resources has impaired Citizen AG's ability to fulfill its mission and … caused financial and operational burdens." (Dkt. #1, ¶ 173.)  "But an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394; *see also 1789 Foundation Incorporated et al. v. Adrian Fontes*, No. CV-24-02987-PHX-SPL Dkt. 17, Order at 8–10 (D. Ariz., Nov. 1, 2024) (finding the injuries Citizen AG alleged there,

13

which are essentially identical to those in this case, were insufficient to establish standing to pursue claims under the National Voter Registration Act in light of *Alliance for Hippocratic Medicine*).

Finally, plaintiffs assert that Citizen AG has "associational standing" to sue on behalf of its members. To sue on behalf of its members, an association must satisfy three requirements: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests at stake are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citation omitted). Here, Citizen AG has not established associational standing either, having failed to show that *any* of its members have standing to bring this suit. To the contrary, as explained above, McKinney *lacks* standing, and she is the only individual person named in the complaint. Likewise, Citizen AG has not established the third requirement of associational standing because only an individual can sue under the DPPA, which creates a cause of action for "the individual to whom the [improperly disclosed] information pertains," but not to a separate legal entity. 18 U.S.C. § 2724(a). 18 U.S.C. § 2724(a). Thus, an organization cannot bring a DPPA lawsuit on behalf of its members who are indispensable.

Because both McKinney and Citizen AG have failed to establish standing, this court lacks jurisdiction to resolve this case and defendants' motions to dismiss under 12(b)(1) must be granted without prejudice.

## II.    Sanctions

Defendants have separately moved for Rule 11 sanctions against plaintiffs and plaintiffs' counsel, contending that they lacked any legal or factual basis to assert their DPPA claim from the outset.  Specifically, they argue plaintiffs' complaint is rife with legally and factually frivolous allegations that they should and would have recognized after conducting any sort of reasonable investigation before bringing suit.  Both defendants also submitted evidence showing that they complied with Rule 11's "safe harbor" provision by serving plaintiffs' counsel a copy of their motions and supporting documents by both first-class mail and email, and waiting at least 21 days before filing this sanctions motion in this court.  (Dkts. ##42-1; 52; 61; 62.)

Federal Rule of Civil Procedure 11 imposes an affirmative duty on attorneys who file documents in court to conduct a reasonable inquiry into the facts and the law before signing a complaint to avoid filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose. *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998); *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1080 (7th Cir. 1987). The court may impose sanctions under Rule 11 if a lawsuit is "not well grounded in fact and is not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." *CUNA Mut. Ins. Soc'y v. Office & Prof'l Emps. Int'l Union, Local 39*, 443 F.3d 556, 560 (7th Cir. 2006) (quoting *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 963 (7th Cir. 1993)).  Further, the court considers whether the accused attorney should have known, objectively, that his claims were groundless at the time that they were filed. *Id.*

Defendants identify five categories of allegations in plaintiffs' complaint as frivolous: (1) Wisconsin is not an ERIC member; (2) ERIC's membership agreement directs it to obtain state DMV records unlawfully and for the purpose of "targeting non-citizens who are not registered to vote . . . [and] adding non-citizens to voter rolls" (dkt. #1, ¶¶ 97–103, 169); (3) ERIC is engaged in an ongoing disclosure of personal motor vehicle data to CEIR as part of a purported conspiracy to influence elections (*id.*, ¶¶ 45, 55, 121, 176); (4) additional misrepresentations about ERIC and Becker engaging in a conspiracy to commit election fraud (*id.*, ¶¶ 46–50; 57–67, 96, 107, 110, 117, 121, 122); and (5) misstatements of the statutory language of the DPPA (*id.*, ¶¶ 164, 165).  The court agrees that at least some of these allegations are legally or factually frivolous.  First, as discussed above, there is no reasonable argument legally or factually that Wisconsin lacks a valid contract with ERIC.  To the contrary, on June 30, 2016, WEC assumed GAB's role under the membership agreement, as confirmed by the agreement itself *and* Wisconsin statute. Wis. Stat. § 266(5).  This kind of intentional "belt and suspenders" by the Wisconsin Legislature and WEC should have been enough notice to any reasonably objective attorney that plaintiffs' arguments to the contrary were and are legally frivolous.

Second, plaintiffs' allegations that ERIC's membership agreement directs states to provide ERIC with information about non-citizens, but only after removing evidence of non-citizenship, is similarly factually frivolous.  Plaintiffs allege that ERIC is deliberately targeting non-citizens for voter registration efforts based on a provision in the membership agreement that states: "Under no circumstances shall the Member transmit an individual's record where the record contains documentation or other information indicating that the

individual is a non-citizen of the United States." (Dkt. #1-6, at 2.)  But this provision clearly *prohibits* states from transmitting motor vehicle records of those who are non-citizens, and plaintiffs' interpretation of this provision to read that ERIC is instead asking states *to transmit* motor vehicle records of non-citizens, deliberately distorts the language of the membership agreement.  Moreover, plaintiffs' interpretation is directly contradicted by other provisions in the membership agreement, which:  request that members include data on "[a]ffirmative documentation of citizenship" and "[t]he title/type of affirmative documentation of citizenship presented" when sharing motor vehicle data; and cabins members' obligations to contact eligible, unregistered voters to only those who are eligible U.S. citizens.  (Dkt. #1-6, at 4, 9.)  Nevertheless, plaintiffs double down on this allegation in their brief in opposition to sanctions by discussing an error that the State of Colorado purportedly made in transmitting the names of non-citizens to ERIC.  (Dkt. #46, at 15.) However, Colorado's apparent failure to comply with the membership agreement restrictions on transmitting non-citizen data in no way supports plaintiffs' allegations that ERIC is involved in a conspiracy to register non-citizens to vote.  Even when given an opportunity to provide evidence of a similar failure in Wisconsin, plaintiffs failed to do so.

Third, the allegation that ERIC is actively disclosing motor vehicle data to CEIR as part of an ongoing attempt to influence elections is also factually frivolous, since even a cursory pre-filing investigation would have demonstrated that ERIC and CEIR have only shared data in two discrete instances, both in 2018 and 2020, at the request of participating members (though *not* at Wisconsin's request), for the limited purpose of conducting a research study.  Specifically, both ERIC's and CEIR's website provide

information about the studies *and* make clear that Wisconsin did *not* participate.  (Dkt. #12-1.)  Additionally, WEC's website explains what ERIC actually does with motor vehicle data provided by the State of Wisconsin and other member jurisdictions, with *no* discussion of CEIR.  (Dkt. #40-1–40-8.)  Thus, plaintiffs lacked any factual basis to assert or good faith basis to believe that ERIC funnels personal data to CEIR on an ongoing basis.  Rather, they knew or should have known the opposite was true.

Fourth, plaintiffs' complaint includes numerous misrepresentations about ERIC's purpose, functions, and activities by claiming that: defendant Becker maintains and exhibits control over ERIC; ERIC has unfettered access to state motor vehicle data and voter rolls; and ERIC engages in lobbying, grantmaking, and partisan activity.  Similarly, other allegations that a reasonable, pre-filing investigation would have proven to be false are thoroughly explained in the declaration and attachments provided by ERIC's executive director.  (Hamlin Decl. (dkt. #41).)

Accordingly, this court finds it more likely than not that a reasonable investigation would have led to publicly available information directly undercutting many of plaintiffs' factual allegations, as well as lone legal claim.  Instead, for reasons on which the court declines to speculate, plaintiffs either failed to conduct a reasonable factual and legal inquiry to uncover this information despite it being required under Rule 11 *or* plaintiffs ignored this information and chose to file their lawsuit anyway. Either way, several assertions in plaintiffs' complaint are legally and factually frivolous and justify the imposition of sanctions.  Thus, the court will require plaintiffs' current counsel, Ronald Coleman, and former counsel, Rachel Dreher, to reimburse defendants for reasonable

attorneys' fees and costs incurred in defending this lawsuit, since both attorneys had an obligation under Rule 11 to ensure that plaintiffs' DPPA claim had a good faith factual and legal basis, but failed to do so.

ORDER

IT IS ORDERED that:

1. Defendants' motions to dismiss (Dkt. #20 and Dkt. #35) are GRANTED and this case is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction.

2. Defendants' motions for sanctions (Dkt. #40 and Dkt. #58) are GRANTED.

3. Defendants may have until July 2, 2026, to submit a request for attorneys fees and costs incurred in defending this litigation, including any supporting affidavits, all legal and expert invoices to date, supporting time records and other evidence of the work done and the reasonableness of hourly rates or fees charged. Plaintiffs may have until July 23, 2026, to oppose the request, but only if they, too, include supporting affidavits, all invoices to date, supporting time records and any other evidence of work done and reasonableness of their own hourly rates or fees charged.

Entered this 11th day of June, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge